MEMORANDUM OF DECISION
On December 11, 1996, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Donna W. to her three children, Darrin, Maurice and Marquette, now ages nine, seven and four. DCF also seeks termination of the parental rights of the biological fathers of the children: Darrin S., Clyde T. and Jerry B., respectively. All three boys were committed to the care and custody of DCF on August 1, 1994, when they were adjudicated neglected children. Their commitment has been extended to the present time. The children were placed in foster care due to their mother's significant emotional and mental difficulties and her psychiatric hospitalizations, which prevented her from being able to care for the children. The fathers were not a part of the boys' lives and were not a resource for them.
The court finds that Donna W. was personally served with the termination petitions for all three children. She has appeared through court-appointed counsel. Service on Darrin S. and Jerry B., the fathers of Darrin and Marquette, was made by publication in The New Haven Register, as their last known address was in New Haven. Clyde T., the father of Maurice, was personally served. The court finds, from the evidence, that proper notice has been given in accordance with the law. Both Donna W. and Clyde T. appeared by counsel. No counsel was appointed to represent either Darrin S. or Jerry B., due to their lack of interest in their sons. The court has jurisdiction in these matters and there is no pending action affecting custody of Darrin, Maurice or Marquette in any other court.
The termination of parental rights petitions for all three children now contain three allegations against the biological parents, with a fourth having been withdrawn at trial. First, DCF claims that the mother and the fathers have abandoned the children. Second, the claim is that the children were previously adjudicated neglected and that the parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, they could assume a responsible position in the life of the children. The third claim is that neither Darrin S. nor Jerry B. has an on-going relationship with Darrin or Marquette, which means the relationship that ordinarily CT Page 10035 develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the children, and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the children. Connecticut General Statutes § 17a-1 12(c)(3)(A), (B), and (D).
Prior to commencement of trial, Donna W. consented to the termination of her parental rights as to Maurice and Marquette. The court accepted her consents and determined that they had been knowingly and voluntarily made, with the advice and assistance of competent counsel and a full understanding of the legal consequences of the consents. Thereafter, the petitions for Maurice and Marquette were amended to reflect her consent to the termination of her rights to them.
 A. FACTS
The court has heard testimony from the DCF social worker, the court-appointed clinical psychologist, Dr. Bruce Freedman, as well as from Clyde T.'s prison counselor and his sister, Maurice's foster mother, who wishes to adopt Maurice. Clyde T. also testified concerning his desire to have his son in his care, despite his present incarceration. In addition, the parties introduced four exhibits. Both Clyde T. and Donna W. attended the trial and, through their counsel, contested the petitions as to Maurice and Darrin, respectively. The fathers of Darrin and Marquette, Darrin S. and Jerry B., failed to appear. The court makes the following findings from the evidence presented at trial.
1. Darrin S. and Jerry B. the biological fathers of Darrin and Marquette W.
Neither of these two men was ever involved with his child, had any contact with the mother after the birth of the child, contacted DCF at any time and or took any action to exhibit any interest in the child. The DCF case worker testified as to the on-going efforts to locate them, through the Departments of Motor Vehicles and Corrections, the United States Post Office and various telephone directories. The court concludes that reasonable efforts to locate them were made throughout the pendency of these actions.
2. Clyde T., the father Maurice W.
CT Page 10036
Clyde T. was incarcerated at the time of trial on convictions for risk of injury to a minor and assault in the fourth degree, as well as for violation of the terms of his probation, a conviction that is under appeal. A counselor from the correctional facility testified that his release date is May 5, 2000. Since his incarceration in 1996, he has had only one visit with Maurice in the week prior to trial. He testified that the facility in which he had been housed until recently was not suitable for visitation and, as a result, he did not request it.
His biological son, Maurice W., will be six years of age on October 15 of this year. In May, 1994, Maurice was informally placed with his parental aunt, Karen B., with whom he still resides. At the time, Maurice's mother, Donna W., did not have stable housing and the child had not received regular medical care. His father, Clyde T., also advised DCF that he could not provide a home for the child. Since living with his aunt, Maurice has blossomed; he is well cared-for and academically progressing at his age level at the home school run by his aunt, which is attended by other children. Mrs B. stated that while her brother Clyde T. was not incarcerated, he had open visitation with Maurice. He failed to visit regularly and did not see his son very often. She testified that she and her husband wish to adopt Maurice, should his father's rights to him be terminated.
Clyde T. testified that in 1994 he was more involved with the children of his girlfriend, who was drug-addicted. He believed these children needed his care and attention and he did not have time for Maurice. He testified now that it was important for Maurice to know his father and that he wanted to be there for his son. He believed that the child should stay with his sister until he is able to care for him and then be returned to him. Unfortunately, Clyde T.'s past actions belie his present verbal sentiments. When his son was available to him and he had open visitation, he did not visit. He did not write, inquire about his welfare, ask his prison counselor for help in getting information about Maurice or do any of the things which remain possible for incarcerated individuals to maintain contact with their children.
During the pendency of this action, Clyde T. was psychologically evaluated by Dr. Bruce Freedman. Dr. Freedman found that Clyde T. had significant judgment problems and preoccupation with his own feelings. He concluded that Clyde T. had great difficulty putting the needs of others ahead of himself and his lack of contact with Maurice supports this observation. CT Page 10037 Dr. Freedman stated that Clyde T. would not be available for the child for some years and had never acted in a parental role for this child. He knew that Maurice had gone to "a home where he had received excellent care and his security and good adjustment were directly related to this placement." His opinion was that to "pull him out of this home and put him in any different home would violate his sense of security." He believed that under such circumstances, the child could well have problems, including an attachment disorder.
3. Donna W., the mother and her son, Darrin.
Donna W. has consented to the termination of her parental rights to Maurice and Marquette and her relationship and interaction with her two youngest sons will not be examined further. She is now thirty-eight years of age and, since her involvement with DCF, has had several psychiatric hospitalizations. Donna W. remains attached to and concerned about the oldest of the the children who is the subject of these petitions. Darrin is, however, not her oldest child. Donna W. has given birth to five children in all, her oldest being a daughter, now eighteen and another son, now age twelve. The two oldest children also did not live with their mother for much of the time during their minority, but were placed informally with relatives and raised by them. At the present time, Donna's oldest child resides with her and is assisting her in caring for Sylvester, her twelve-year-old son, who is also in the home.
Dr. Freedman evaluated Donna W. He testified that the mother has been variously diagnosed with bi-polar disorder, schizophrenia and depression with psychotic features. She had significant emotional and mental problems and has had extreme difficulty managing the basics of her own independent living. She had been psychiatrically hospitalized at different times in her life. In his report[2], he stated: "She has shown signs of poor judgment, problems in thought, inhibited emotional functioning and extreme difficulty in her interactions with others." When he observed her with the children in February, 1998, she was not able to sustain any interaction with them. He believed that with another adult in the home, she could possibly provide care for an older child, but in his opinion, not for Darrin, who has significant specialized needs.
Since the involvement with DCF, Donna W. has received many services to assist her to care for her children. Those services CT Page 10038 include a referral to the Hill Health Center for family counseling and parenting skills, the New Haven Family Alliance which provided her with a community resource person as part of Intensive Family Preservation Services, the Visiting Nurse Association to monitor Marquette's feeding as an infant, the Yale Child Study Center with individual therapy for Darrin and an evaluation of Donna, the Birth to Three Program for Marquette and an Early Child Assistance Team evaluation for Marquette. Donna W. was at the Connecticut Mental Health Center for an inpatient hospitalization and then attended a day program with individual and group counseling. She received medication for her diagnosed condition, major depression with psychotic features. She was hospitalized at Yale New Haven Hospital psychiatric unit after a suicide attempt in 1996. She received case work services and assistance in securing city welfare to maintain housing and income for herself. At present, she has been found eligible for Social Security Disability income and is regularly receiving this income.
During the times of her hospitalization and subsequent release into the community, she often failed to take the medication and therapy which permits her to continue her life on a reasonably steady course. When on medication and with the assistance of other adults in the household, she has in the past managed regular visits with Darrin extending as long as four months, only to fail to maintain such contact when her illness reasserts its hold upon her. Twice since 1994 Darrin has been returned to her care, only to be removed later when she could no longer care for him.
Darrin, like his younger brothers Maurice and Marquette, has been in placement for a long time. He has had extreme difficulties in adjusting to these placements, due to his significant emotional problems. He has had to be psychiatrically hospitalized on two occasions recently. He has also been diagnosed with Attention Deficit Hyperactivity Disorder and a psychotic disorder. Since March, 1998, he has been in four different foster home placements, where he was not able to be managed. He has now been placed in residential care, where he continues to receive medication for his conditions. The DCF social worker, Jeannette Morrison, testified that at times Darrin has been totally out control, reporting on one occasion where she saw him at the psychologist's office, beating up toys, shooting dice against the walls and refusing to sit down. Given his difficulties and his age, the prospects for him are long term CT Page 10039 placement in a specialized therapeutic foster home, with trained and skilled foster parents able to meet his considerable care needs. She testified that adoption is not likely to be an option for Darrin, given his age and condition. Further, it is expected that he will remain in the residential facility where he is now housed for some time to come, as he is able to be managed there, but with some difficulty.
When Darrin was evaluated by Dr. Freedman in early 1998, he had not yet begun the extreme acting-out which ended with his hospitalization and ultimate placement in a residential home. At that time, however, Dr. Freedman found that he was extremely active, fidgety and argumentative. When he asked him to draw, he made attempts to draw cartoon figures familiar to him, but was dissatisfied with them. He concluded:
 "This excessive self-criticism seemed an unfortunate effect of his lack of security and attachment to a caretaker and would be likely to contribute to his behavior problems. Darrin would need much attention, praise and a high level of parental skill to help guide him to more peace of mind, self-confidence and better behavior. . . . Darrin was a child who showed signs of insecurity, much anger turned inward and painful self-doubt. He was the type of child who desperately needed security, but provides intense testing and defensiveness which tend to keep caretakers at a distance. He seemed upset and jealous that his younger brothers had secure homes while he did not."
At trial, Dr. Freedman did not find the subsequent course of Darrin's life in the spring and summer of 1998 surprising. He stated that Darrin is a very active, angry and oppositional child who tests adult authority and limits. He is insecure and needs a lot of attention and has severe behavior problems. In his opinion, this child would test the patience of any adult and requires a high level of skill to manage. When questioned as to the value of maintaining a visiting relationship with his mother, he stated that "visiting would not be without its problems" as mother had been disruptive to the child in the past, promising him he could come and live with her and then being hospitalized and not having contact for a long period of time. Sadly, he said:
 "Not every child gets to have a happy ending when they come before this court. His future is not that optimistic; considering all that, some limited visiting where the mother was watched could provide some glimmer of hope and help him out".
CT Page 10040 He did not believe that Donna would be able to handle Darrin in her household even with another adult present. He believed that the more important factor for Darrin is the full-time placement for the child, not contact with the mother.
Nevertheless, for Darrin, the one bright spot in his life has been his sporadic contact with his mother, which he looks forward to. The social worker reported that this child understands that his mother is ill from time to time and is unavailable to care for him. He has consistently, however, asked for her and wants to be with her. He is the child who spent the longest time in her care prior to his removal. He is the only child with whom Donna has had supervised visitation throughout the years since 1994, having relinquished her contact with Maurice and Marquette and not visited with these two children since 1996. Ms. Morrison stated in her opinion, Darrin and Donna have a good relationship together. He views Donna W. as his mother and wants to be with her.
Dr. Freedman, however, in observing Donna with Darrin in February, 1998, found that Darrin showed a high level of emotional distress and behavior problems, in part because Donna offered no attention, activity or conversation during this session. She did not interact with the younger children and even with Darrin, she offered minimal attention or guidance. She seemed more connected to him, but did not have the skills to manage even this brief visit.
 B. TERMINATION ADJUDICATION
1. Darrin S., Clyde T. and Jerry B., fathers of Darrin, Maurice and Marquette W.
The court finds, by clear and convincing evidence, that all three grounds pursued at trial against Darrin S., Clyde T. and Jerry B. have been proven. The first ground, abandonment, has been proven by the clear and convincing evidence against them. Abandonment focuses on the parent's conduct. In re Michael M.,29 Conn. App. 112, 614 A.2d 832 (1992); In re Rayna M.,13 Conn. App. 23, 36, 534 A.2d 897 (1987); In re Kezia M.,33 Conn. App. 12, 632 A.2d 1122 (1993). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re JuvenileCT Page 10041Appeal (Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801 (1981). For Clyde T., the only father who ever exhibited any interest in his child, the evidence has shown that he has not pursued visitation with Maurice, does not display love, affection, or concern reliably for him and has abandoned Maurice in the commonly understood meaning of that word. His eleventh hour wish to know his son and to have him come to live with him several years in the future upon his release from incarceration is unconnected to the needs of this child and cannot undo his abandonment of Maurice. And if this is sadly the case for Clyde T., it is all the more the case for the two absent biological fathers, Darrin S. and Jerry B., who have never had any relationship with Darrin or Marquette, respectively. For all of the biological fathers, this ground has existed for more than a year prior to the filing of the termination petitions.
Based on clear and convincing evidence, the court also concludes that all three have also have failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, they could assume a responsible position in the lives of these children. Connecticut General Statutes §17a-112(c)(3)(B). "`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. In re Migdalia M.6 Conn. App. 194, 203, 504 A.2d 532 (1986). See also: In reJuvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795, cert.denied, 193 Conn. 802, 474 A.2d 1259 (1984). None of these three biological fathers has done anything to rehabilitate himself.
Also alleged against the fathers of Darrin and Marquette is that they have no on-going relationship with their sons. Their complete and total absence in their children's lives proves by clear and convincing evidence that there is no on-going relationship and the court so finds. The evidence also proves that the last two grounds have existed as to all biological father for more than one year prior to the filing of the termination petitions.
2. Donna W., mother.
DCF has alleged that Donna has abandoned Darrin, citing the many times that she has been unavailable to the child as grounds for this conclusion and setting forth in detail the many times she failed to visit with Darrin for several months. Also cited CT Page 10042 are her failures to take her medication regularly and attend counseling. While it is the case that Donna ceases to be involved with Darrin as her illness progresses and that it does so in part because of her failure to take her medication, both facts are consequences of her illness and not any desire on her part. She does display love, interest and affection for Darrin to the extent she is able and, as stated by other observers, is connected to him. Her ability to do so increases when the symptoms of her illness are under control. During those times, she visits regularly and the latest visits have helped Darrin stabilize during his current residential placement. She has expressed concern for his welfare and he is attached to her.
DCF claims that because of her periodic absences from Darrin's life, Donna W. has not maintained a relationship with Darrin. As was stated in the case of In re Migdalia M.,6 Conn. App. 194, 210, 504 A.2d 342 (1986), the word "maintain" as used in the abandonment statute has a specific meaning." "Maintain" implies a continuing, reasonable degree of concern . . . A failure to telephone the child or to travel thirty miles to visits with her when the mother has neither a telephone or a car is not a ground for finding abandonment." In Donna W.'s case, she does not lack the physical means to visit with her child in the manner set forth, but from time to time she lacks the emotional and psychological capacity to do so. At the present time, her housing and income has stabilized as she has navigated through repeated appeals to secure Social Security Disability income. She also has the assistance of her eighteen year old daughter. The court cannot find in this case that there has been clear and convincing evidence of abandonment of Darrin by his mother.
The remaining allegation against Donna W. is that Darrin was previously adjudicated neglected and that she has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of this child. Darrin was adjudicated a neglected child on August 1, 1994. Donna has, on repeated occasions, been able to sustain a regular living situation for herself and has had Darrin returned to her on two occasions, only to relinquish him when she could no longer care for him. She has attended some counseling and group sessions, but in the opinion of Dr. Freedman, she would be unable, even with the assistance of another adult in the household on a full-time basis, to parent this child. Darrin is nine years old and is a child with highly CT Page 10043 specialized needs. He has been in foster care almost half his life. Given his age and needs, he cannot wait any longer for his mother's rehabilitation. The court finds from the clear and convincing evidence that Donna has failed to achieve such a degree of rehabilitation as would encourage the belief that, within a reasonable period of time, she could care for Darrin. The court further finds this situation had been the same for more than one year prior to the commencement of the termination petition on December 11, 1996.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were offered by the Department of Children and Families, including referrals to the Hill Health Center for family counseling and parenting skills, Intensive Family Preservation Services, the Visiting Nurse Association to monitor Marquette's feeding as an infant, the Yale Child Study Center with individual therapy for Darrin and an evaluation of Donna, the Birth to Three Program for Marquette and the Early Child Assistance team evaluation for Marquette. Donna W. received case work services and assistance in securing city welfare to maintain housing and income for herself as well as transportation and visitation services. No services were offered to Clyde T., except visitation services, as he has not been available to benefit from them. No services were offered to either Darrin S. or Jerry B., as neither ever was available or made himself known to DCF.
2) The court finds from the clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible.
3) DCF entered into reasonable and realistic court expectations. Donna W. has not been able to meet those expectations except sporadically due to her illness. Clyde T. has made no attempt to do so. None was set for Darrin S. or Jerry B, as they have remained unavailable.
4) The court finds from the evidence that Maurice and Marquette have strong emotional ties to the foster families with whom they each reside. They enjoy sibling visits with each other CT Page 10044 and with their older brother Darrin. The two youngest children do not know their father and have no connection to their mother, who has consented to the termination of her parental rights. Darrin W. does not know his father, but he remains attached to and connected to his mother, who also is connected to him. His foster home placements have been difficult and disrupted by his behavior and hospitalizations. He has no connection to any foster family at this time.
5) Regarding the ages of the children, the court finds that Darrin became nine years of age on September 2, 1998, Maurice will be six on October 15 and Marquette is four years and ten months old.
6) This finding concerns the efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. None of the fathers has done anything to adjust his circumstances to make it in the best interests children to be returned to him. Donna W., when she is stable and receiving regular medication and counseling, is able to visit with Darrin and has adjusted her circumstances as much as she is capable. Nonetheless, given Darrin's needs and difficulties, Dr. Freedman concluded that she is unable to care for Darrin on a regular basis, even with another adult in the home.
7) Regarding the prevention of the parents from having a meaningful relationship, DCF has taken many steps to encourage Donna to have a meaningful relationship with Darrin and to rehabilitate herself. As to the biological fathers, DCF has taken all reasonable steps.
 D. DISPOSITION
Maurice and Marquette are in separate foster home placements where they are doing well. Each has had regular contact with the other and with Darrin. The foster parents for both children wish to adopt them, if the boys are freed for adoption. Donna W. has consented to the termination of her parental rights to these two CT Page 10045 boys. There is no connection between Clyde T. and Jerry B. and these children, who have been abandoned by their fathers. The children do not know their fathers. The court concludes, from the evidence, that the boys' needs for stability and permanency are best met by termination of their parents' rights to them. The court finds termination to be in their best interests so that they may continue the progress and growth already attained with the families with whom they have been placed. The court orders that the rights of Clyde T. to Maurice W. and of Jerry B. to Marquette W. be terminated. The court further orders the rights of Donna W. to these two children terminated.
Darrin's situation with respect to his biological father is similar to that of his siblings. He has been abandoned by Darrin S., who has never exhibited any interest in him. Darrin does not know his father or have any connection to him. The court concludes, therefore, that it is in his best interests that the rights of Darrin S. to his biological child, Darrin W., be terminated and it is so ordered.
For Darrin W., however, there are no foster parents willing to accept him into their family. He remains in a residential home and the only strong connection he has is to his mother. The long term plan for him is to place him in a therapeutic foster home, once he is sufficiently stable and such a home is located. The testimony has shown that at present the visits he has with his mother help to stabilize him and improve his behavior. The court has found that there was clear and convincing evidence that the grounds for termination, as alleged, existed in that Donna W. cannot now care for Darrin, nor is it likely that she could do so in the foreseeable future, measured from the viewpoint of Darrin's age and needs. Nonetheless, there exists a strong and generally positive mother-son connection.
Counsel have suggested that termination of Darrin's mother's rights to him is at best a legal fiction. Darrin is not likely to be adopted and, if adoption were available, given his present age and connection to his mother, he would not likely welcome it. As a consequence, the probable outcome for him, whether or not his mother's rights to him are terminated, is long term foster care. The Appellate court in In re Migdalia described similar circumstances, when it observed in dicta:
 "Jurisdictions with statutes requiring proof that a termination of parental rights is in the best interest of the child have CT Page 10046 usually found termination to be appropriate if a parent has failed over an extended period of time to adjust his or her behavior to provide for the physical needs of a seriously ill or handicapped child. If, however, the parents of a child with developmental disabilities have parenting limitations but love their child, consistently express an interest in the child's welfare, and periodically visit with the child committed to foster care, parental rights should not be terminated unless the effect on the child is detrimental, since the situation affords the child both the consistency of foster parenting and the relationship with the natural parents." In re Migdalia M., 6 Conn. App. at 207-208 (emphasis added and internal citations omitted).
Donna W., given her psychiatric difficulties, has considerable parenting limitations. Nonetheless, she has visited with Darrin and expressed an interest in him, to the extent she is able, given these limitations and the nature of her illness. While Darrin does not have the extreme medical difficulties of Migdalia M., he has, as observed by Dr. Freedman, specialized needs and is a difficult child for even a highly skilled adult to parent. Donna is not capable of parenting him in her household, even with the assistance of an adult in the home on a full time basis. Yet the love and affection mother and child feel for each other cannot be ignored. Given the circumstances, the court concludes that is not in Darrin's best interests to legally sever all connection to his mother. The court therefore denies the termination petition as to Donna W. and Darrin W.
Based on the court's findings, it is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for Maurice W. and Marquette W. for the purpose of securing adoptive families and a permanent placement for them. If their present foster parents remain willing to adopt them, it is the court's direction that they receive first consideration. In addition, the Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placements and file further reports as are required by state and federal law.
As to Darrin W., he was previously committed to the Commissioner of the Department of Children and Families as a neglected child. The plan for him is long term foster care. To the extent it is before the court, the court concludes that plan CT Page 10047 remains in Darrin's best interests. Further, based on the evidence, at the present time, ongoing visitation with Donna, as deemed appropriate by his caretakers and DCF, continues to be in his best interests and should be continued at the discretion of DCF.
Barbara M. Quinn, Judge Child Protection Session